**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| MOMOCON, LLC, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 21-2386 (RC) |
| | : | | |
| v. | : | Re Document No.: | 53, 55 |
| | : | | |
| SMALL BUSINESS ADMINISTRATION, | : | | |
| *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

<u>**MEMORANDUM OPINION**</u>

GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S

MOTION FOR SUMMARY JUDGMENT

Plaintiff MomoCon, LLC ("MomoCon")[1] began this action against the Defendants, the

U.S. Small Business Administration and its Administrator, Isabella Casillas Guzman

(collectively, "SBA") seeking review of the SBA's denial of MomoCon's application for

Shuttered Venue Operators Grant ("SVOG") funds.  The Court previously granted summary

judgment for MomoCon and remanded the case to the SBA.  On remand, the SBA denied

MomoCon's application for a second time.  MomoCon once again moves for summary

judgment, arguing that the SBA's denial violated the Administrative Procedure Act ("APA")

because the SBA failed to consider relevant factors and reached a decision unsupported by the

administrative record.  The SBA also moves for summary judgment, asserting that it weighed the

---

[1] This opinion generally uses "MomoCon" to refer to both the corporate entity as well as the convention event that it hosts, but for clarity, it will at times refer to "MomoCon 2019" or "MomoCon 2020."

factors required by the statute and made a decision supported by substantial evidence.  For the reasons stated below, the Court grants the SBA's motion and denies MomoCon's motion.

## I.  BACKGROUND

### A.  SVOG Program

When COVID-19 forced many live event venues to close, Congress passed the Economic Aid to Hard-Hit Small Businesses, Nonprofits and Venues Act, which established the SVOG program to offer financial relief to shuttered venue operators.  *See* Pub. L. No. 116-260, § 324. Between the initial appropriation and additional funding in the later-passed American Rescue Plan, Congress allocated over $16 billion in grants that were to be administered by the SBA's Office of Disaster Assistance.  *See id.*; Pub. L. No. 117-2, § 5005(a).  SVOG is an "emergency assistance" program that stopped accepting new applications on August 20, 2021.  *Shuttered Venue Operators Grant,* U.S. Small Bus. Admin., https://www.sba.gov/funding-programs/loans/covid-19-relief-options/shuttered-venue-operators-grant (last accessed December 22, 2023).

The statute lists several categories of entities that are potentially eligible for a grant, including "live venue operator[s] [and] promoter[s]."  15 U.S.C. § 9009a(a)(1)(A).  To fall into that category, an applicant must be "an individual or entity . . . that, as a principal business activity, organizes, promotes, produces, manages, or hosts live concerts, comedy shows, theatrical productions, or other events by performing artists," for which there is (1) a ticketed entrance charge, (2) performers are paid based on a percentage of sale or guaranteed amount by

contract, and (3) not less than 70% of revenue is generated through ticket sales or event

beverages, food, or merchandise.[2]  *Id.* § 9009a(a)(3)(A)(i)(I)–(II).

The SBA offered guidance about its approach in a notice inviting SVOG applications,

where it explained that:

> Principal Business Activity is determined using a firm's primary industry under the SBA size regulations (13 CFR 121.107) to define "principal business activity." To determine a given firm's principal business activity, the SBA will consider the distribution of an entity's receipts, employees and costs of doing business among the different lines of business activity in which its business operations occurred for the most recently completed fiscal year. The SBA may also consider other factors, such as the distribution of patents, contract awards, and assets, as appropriate.

SBA, *Applications for New Awards; Shuttered Venue Operators Grants* (SVOG), 86 Fed. Reg.

16270, 16272 (Mar. 26, 2021).  And the SBA also stated that when an entity has multiple lines of

business, its principal business activity is "the line of business in which the entity has the greatest

combined amount of revenues, expenses, employees and work hours, assets, contracts, and other

business activity as compared to all its other lines of business." SBA, *Shuttered Venue Operators*

*Grants FAQs*, Definition 26 (Oct. 20, 2021), https://www.sba.gov/sites/default/files/2021-10/10-

20-21%20SVOG%20FAQ%20FINAL_508_final.pdf (last accessed December 22, 2023).

### B.  MomoCon

MomoCon produces an annual 4-day anime-themed convention in Atlanta, Georgia.[3]

MomoCon "brings together fans of Japanese Anime, American Animation, Comics, Video

---

[2] As an alternative option, an individual or entity may also qualify if it, "as a principal business activity, makes available for purchase by the public an average of not less than 60 days before the date of the event tickets to events" for which the performers are paid based on a percentage of sales, a guarantee, or another mutually beneficial formal agreement.  15 U.S.C. § 9009a(a)(3)(A)(ii).  The statute also sets forth other general eligibility criteria that are not relevant to this action.

[3] The name of the convention references its location: "momo" means "peach" in Japanese.  *See* Atlanta Magazine, *MomoCon Rising: The Growing Atlanta Anime and Gaming Convention Courts a New, Younger Fandom* https://www.atlantamagazine.com/news-culture-

Games, and Tabletop Games to celebrate their passion by costuming / cosplay, browsing the huge exhibitors hall, meeting celebrity voice talent, designers, and writers behind their favorite shows, games, and comics and much [,] much more over this 4 day event." *See* https://www.momocon.com (last accessed December 22, 2023).  In addition to the exhibition hall, cosplay opportunities, meet and greets, and gaming, MomoCon also features panel discussions, live musical performances, and theatrical productions.  Administrative Record ("AR"), ECF Nos. 65-2, 65-3, 65-4, 65-5, at 56, 1547.[4]  MomoCon 2019 ran from May 23 to 26, 2019, with tickets to the event available as either four-day or single-day packages. *Id.* at 1817. MomoCon 2020 and MomoCon 2021 were both cancelled due to the COVID-19 pandemic.

### C.  MomoCon's Application and This Action

On April 26, 2021, MomoCon applied as a live venue operator for a SVOG grant of $1,044,330.08.  AR 1678.  The SBA denied MomoCon's application, and MomoCon submitted an administrative appeal, which the SBA also denied.  AR 56; *see* Second Am. Compl. ¶ 30, ECF No. 48-1.

On September 9, 2021, MomoCon brought this action for judicial review of the SBA's denial of its SVOG assistance request.  *See* Compl., ECF No. 1.  The Court approved the SBA's motion for voluntary remand.  *See* Oct. 1, 2021 Order.  On October 15, 2021, the SBA issued another denial of MomoCon's application, saying that MomoCon had failed to establish the requisite principal business activity. AR 1696–97, 1700.  MomoCon challenged this decision again, and both parties moved for summary judgment.

---

articles/momocon-rising-growing-atlanta-anime-gaming-convention-courts-new-younger-fandom/ (last accessed December 22, 2023).

[4] Citations to the AR use the Bates numbers located at the bottom of each page but omit the leading zeros; e.g., AR 1517 refers to the page marked as "SBA_01517".

On February 10, 2022, the Court granted MomoCon's motion for summary judgment and remanded the matter to the SBA.  Mem. Op., ECF No. 32.  The Court held that the SBA's denial was arbitrary and capricious because the SBA "fail[ed] to explain why it treated MomoCon differently than other potentially similar companies," *id.* at 9, and instructed the SBA to "supplement[] the administrative record as necessary regarding MomoCon's competitors," *id.* at 20.  The Court also directed the SBA to revisit its conclusion that MomoCon did not satisfy the SVOG statute's "principal business activity" requirement, holding that the SBA did not properly consider the record and evidence before the agency.  *Id.* at 16.

On remand, the SBA issued a new decision, dated June 17, 2022, that once more determined that MomoCon was ineligible for SVOG funds.  AR 1782–91.  The SBA amended the decision on July 15, 2022, and again on August 1, 2022, when it issued the Second Amended Final Remand Decision ("Final Remand Decision").  AR 1795–1804; *id*. at 1815–24.

### D.  The SBA's August 1, 2022 Decision

The SBA concluded that MomoCon was not eligible for a SVOG award because the record did not show that 70% of MomoCon's earned revenue was attributable to qualifying live events, or that as a principal business activity, MomoCon sold tickets 60 days in advance for qualifying live performing arts events.  *Id.* at 1824.  The SBA explained that it followed the definition of principal business activity that is listed on the SBA website.  *Id.* at 1816 (citing SBA, *Shuttered Venue Operators Grants FAQs*, Definition 26, *see supra* at 3).

In assessing MomoCon's revenue, the SBA observed that MomoCon did not sell tickets to separate events but to the convention as a whole, and so the SBA decided to apportion

MomoCon's revenue with reference to the hours of events.[5]  *Id.* at 1822–23.  The SBA added up the hours of live performances at MomoCon 2019 based on its review of an archived copy of a schedule for the event, as well as through promotional headliner flyers and the performing artist contracts MomoCon submitted with its application.  *Id.* at 1816–17, 1822–23; *see* Archived MomoCon 2019 Convention Schedule ("Convention Schedule") http://web.archive.org/web/20190506064635/https://www.momocon.com/schedule/ (last accessed December 22, 2023).  As the baseline for the total hours of events, the SBA relied on MomoCon's own estimate that it held over 800 hours of programming—a figure that counts simultaneously held events as separate hours.  *Id.* at 1822.  Upon its consideration of the record, the SBA calculated that out of these approximately 800 hours, MomoCon 2019 had 24 hours of SVOG eligible live performances.[6]  *Id.*  Thus, the SBA determined that these 24 hours accounted for 3% of MomoCon's events, significantly below the 70% threshold required under the SVOG statute.  *Id.*  The SBA also considered an alternative scenario where it instead viewed the hours of the convention consecutively, for an assumed total of 60 hours, and found that the 24 hours of eligible live performances would be 40% of the convention time, still below the 70% threshold. *Id.* at 1822 n.1.

Then, to give MomoCon "the benefit of the doubt" that there were additional eligible events that the SBA missed in its assessment of 24 hours (or 3%), the SBA proceeded with an

---

[5] To be fully accurate, as the SBA recounted in the Final Remand Decision, MomoCon 2019 did have one separately ticketed event.  *See* AR 1823.  However, revenues from this event were just $16,120, about 1% of the estimated $1,224,261 in ticket sales.  *Id.*  Because this small fraction of revenue would have no impact on whether MomoCon met the SVOG threshold, this opinion will not discuss it further.

[6] The SBA also compared the hours of music performances in MomoCon's two main venues to the number of hours of all activities in those venues and found that music performances accounted for 25% of total presentation time.  *Id*. at 1822.

assumption that a total of 10% of the events were live performing events. *Id.* at 1822. The SBA applied this percentage to MomoCon's ticket sales revenues. *Id.* at 1822–23. Again, the SBA noted that this number was well below the SVOG 70% threshold. *Id.* at 1823. As a result, the SBA determined that MomoCon did not satisfy the criteria for a SVOG grant and denied the application.[7] *Id.* at 1822–24.

Finally, the SBA also responded to MomoCon's argument that it was entitled to receive a SVOG award because it was indistinguishable from competitors who did receive an award. The Final Remand Decision incorporated a "MomoCon LLC Competitor Analysis," *id.* at 1792–94, that looked at MomoCon's alleged competitors. *Id.* at 1824. Using a similar method as the agency used for MomoCon itself, and looking at the hours of eligible live events, the SBA found that these five purported competitor conventions also did not meet the SVOG 70% criteria. *Id.* at 1793–94. The Final Remand Decision stated that the SBA's SVOG Deputy Director had determined that the competitors identified by MomoCon were ineligible for SVOG awards and that she would recommend their awards be referred to the agency's recoupment process. *Id.* at 1824.

MomoCon now moves for summary judgment, arguing that the SBA's second denial was arbitrary and capricious because the agency failed to weigh the significance of the events, and did not correctly identify all of the eligible live events. Pl.'s Mem. P. & A. Supp. Mot. Summ. J. ("Pl.'s Mem."), ECF No. 53. The SBA also moves for summary judgment, arguing that the Final Remand Decision was consistent with the statute and supported by the evidence. Defs.'

---

[7] Consistent with the SVOG statute, the SBA also analyzed MomoCon's expenses, but found that there was a lack of documentation to support allocating any portion of MomoCon's general overhead expenses to live performances. AR 1823. Nonetheless, the SBA applied the 10% allocation to expenses as well, which still did not show eligibility for a SVOG award. *Id.*

Combined Mem. Supp. Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J. ("Defs.' Opp'n & Mem.")
at 6–7, ECF No. 55.

In addition, the SBA also filed a motion to stay, which MomoCon opposed.  Defs.' Mot.
to Stay, ECF No. 59; Pl.'s Mem. P. & A. Opp'n Defs.' Mot. to Stay, ECF No. 61; Defs.' Notice
Regarding Mootness, ECF No. 68; Pl.'s Resp. Defs.' Notice Regarding Mootness, ECF No. 69.
Although the SBA argued that the Court should stay the case until the D.C. Circuit resolved
*Concert Investor, LLC v. Small Business Administration*, No. 22-5233 (D.C. Cir. filed Sept. 29,
2022), the Court held that the outcome of that appeal in a similar case would not be dispositive to
the outcome of the present motions for summary judgment, and therefore denied the motion to
stay.  *See* Mem. Op. & Order Denying Mot. Stay, ECF No. 72.

## II.  LEGAL STANDARD

Although Rule 56 requires a court to grant summary judgment "if the movant shows that
there is no genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law," Fed. R. Civ. P. 56(a), "in APA cases, the summary judgment standard functions
slightly differently, because the reviewing court generally reviews the agency's decision as an
appellate court addressing issues of law," *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum.
Servs.*, 313 F. Supp. 3d 62, 74 (D.D.C. 2018) (cleaned up); *see also Rempfer v. Sharfstein,* 583
F.3d 860, 865 (D.C. Cir. 2009).  Stated another way, "[t]he entire case on review is a question of
law, and only a question of law." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221,
1226 (D.C. Cir. 1993).  Accordingly, "the court must limit its review to the administrative record
and the facts and reasons contained therein to determine whether the agency's action was
consistent with the relevant APA standard of review."  *Pol'y & Rsch., LLC*, 313 F. Supp. 3d at
74 (internal quotation marks omitted).  However, judicial review pursuant to the APA may go

beyond the administrative record "when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) (internal quotation marks omitted) (quoting *Com. Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998)).

Under the APA, a court should uphold an agency's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard of review is "narrow," but the court must still determine whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An agency decision "would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* A court will defer to the agency's interpretation of the statutory requirements so long as it is "rational and supported by the record." *Cooper Hosp. / Univ. Med. Ctr. v. Burwell*, 179 F. Supp. 3d 31, 39–40 (D.D.C. 2016) (quoting *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1240 (D.C. Cir. 2011)).

## III. ANALYSIS

The parties dispute whether the SBA acted arbitrarily or capriciously in once again denying MomoCon's application for SVOG funds. The parties focus on two issues: (1) whether

the SBA was obligated to assess the "significance" of MomoCon's live events and (2) whether the SBA correctly calculated the proportional hours of live events at MomoCon 2019. The Court holds that the SBA's decision to reject MomoCon's SVOG application was consistent with the statute, fairly considered the evidence available to the agency, and was supported by that evidence.

The Court also considers MomoCon's contention that the SBA still has not addressed its unequal treatment compared to competitor applicants that did receive SVOG awards. The Court rejects this argument as well, finding that the SBA adequately explained that it had determined those awards were improper and has begun the recoupment process.

## A. The SBA's Approach Was Consistent with the SVOG Statute and SBA Guidance

MomoCon's principal argument is that the Final Remand Decision should be invalidated because the SBA failed to consider the significance of live performing events to the convention. *See Borgess Med. Ctr. v. Sebelius*, 966 F. Supp. 2d 1, 5 (D.D.C. 2013) ("Under the arbitrary and capricious standard, an agency action 'may be invalidated . . . if [it is] not rational and based on consideration of the relevant factors." (alterations in original) (quoting *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 803 (1978))), *aff'd sub nom. Borgess Med. Ctr. v. Burwell*, 843 F.3d 497 (D.C. Cir. 2016). The SVOG statute does not require the SBA to weigh significance. *See generally* 15 U.S.C. § 9009a. SBA regulations do advise that the agency will look at "other factors . . . as appropriate." *Applications for New Awards*, 86 Fed. Reg. at 16272.

MomoCon argues that significance was an appropriate factor that the SBA should have looked at, even asserting that the live qualifying performing events "are the reason people come to [the] event." Pl.'s Reply Supp. Mot. Summ. J. and Opp'n Defs.' Mot. Summ. J. ("Pl.'s Reply") at 2, ECF No. 57. But this argument has two fatal flaws. First, determining the relative

significance of particular events at MomoCon would be a highly subjective and difficult

exercise.  MomoCon appeals to a broad range of interests; it is not themed around any specific

media franchise or activity, but instead features a wide swathe of programming that relates to

Japanese culture.  Because there are so many different types of events at MomoCon, it naturally

follows that guests will diverge on their reason for attendance.  MomoCon offers no basis for

how the SBA should have determined whether an attendee was drawn to the convention because

of live music, panels, merchandise sales, gaming, or any other category of event.  Moreover,

within those categories, attendees would diverge about what entertainment franchises drew their

interest.  While it is possible that an individual would choose to attend MomoCon based on one

specific interest, it is far more likely that attendees would buy tickets because they saw a variety

of events and media products they enjoyed on the schedule.[8]

Second, beyond that conceptual hurdle, MomoCon has no record evidence to support its

assertion that live performing events are the primary driver of attendance.  MomoCon mostly

cites to its own self-serving statements made while applying for SVOG funds.  *See id.* at 3 (citing

AR 56–57, 61, 66, 79, 1547).  MomoCon also points to "evidence of the live shows' primacy in

MomoCon's marketing materials," *id.* at 2.  But it rests this statement on a handful of flyers that

advertise the existence of live concert events, *see* AR 866, 882–84, but do not suggest that these

---

[8] To illustrate the point, the convention schedule for MomoCon 2019 includes several events related to the popular Pokémon video game franchise, as well as other opportunities such as cosplay (dressing up as fictional characters) where an individual could express their passion for Pokémon.  *See* Convention Schedule.  But MomoCon is not Pokémon themed—these events are a tiny portion of the convention, and many other video game franchises are also present on the event schedule.  Additionally, many of these franchises have overlapping fanbases: people who enjoy Pokémon also have a higher than usual chance of liking other Nintendo video games that have a presence at MomoCon, such as Super Mario or The Legend of Zelda.  Therefore, even an individual who is especially interested in Pokémon may spend much of their time at MomoCon at other video game events—not to mention the hundreds of events that relate to anime, manga, comic books, internet-related media, and other cultural products.

events were a predominant feature of MomoCon's marketing.  This lacking presentation does not

persuade the Court that SBA should have considered the significance of the live performances,

or that this was an "important part of the problem" that it missed.  *State Farm*, 463 U.S. at 43.

Instead, the SBA's quantitative approach allowed it to objectively analyze how

MomoCon's live events factored into the convention.  MomoCon's nature as a parallel

programming event supports the SBA's decision to look at the total number of programming

hours in comparison to the number of SVOG-eligible live event hours.  *See* AR 1822 (noting that

MomoCon itself asserted that it held over 800 hours of programming in 2019).  To take just one

example, at any given time of the SVOG-eligible "Bytes & Beats" live performing event on

Friday of MomoCon 2019, at least thirteen other events were occurring simultaneously.  *See*

Convention Schedule.  The SBA had no method of determining the significance of any

individual events (and MomoCon proposes no way to do so, providing only bald assertions that

qualifying live performances as a general category were the most significant part of the

convention) so it was rational that the SBA looked at what proportion of events were qualifying.

Still, MomoCon argues that the SBA should have at least weighed the relative size of

attendance and venues for the live performing events, noting that there were "over 8,000 people

at its EDM concert" at MomoCon 2019, and that it planned a concert with a capacity of "nearly

10,000" for MomoCon 2020.  Pl.'s Mem. at 12.  MomoCon further explains that "the 1,726-seat

Sidney Marcus auditorium and the 2,000-seat custom-build arena (Main Stage) are used almost

entirely for music performances."[9]  *Id.*  But again, MomoCon did not provide evidence of the

capacity of other venues or the actual attendance at most programming, making it impossible for

---

[9] This statement runs counter to the SBA's determination that 25% of the programming at
these events was an eligible live event.  AR 1822.

the SBA to estimate how many attendees would have been at eligible live events versus ineligible live events at a given time.  And even if the SBA's analysis included the size of these venues, this additional factor would have likely weighed against MomoCon.  Given that MomoCon 2019 "had over 39,000 attendees," AR 1548, the fact that around 8,000 people, or less than 25%, of those attendees went to the EDM concert does not support the proposition that this event was of primary significance to the convention.  And that comparison is true to a greater degree for the other two venues that MomoCon mentions, assuming full capacity attendance of 1,726 and 2,000 guests.  Pl.'s Mem. at 12.  Thus, the SBA's omission of venue capacity as a factor does not render its analysis arbitrary or capricious.

Also, MomoCon's contention that "neither the decision nor Defendants' brief give any explanation for counting each hour of activity at MomoCon's event the same when MomoCon had emphasized that the live shows are the most important part of the event," Pl.'s Reply at 3, is a rephrased version of the significance argument, and unsuccessful for the same reasons.  The SBA's decision to treat all hours equally was a recognition that attendees could choose from many different events at any given time—just as it was difficult for the SBA to assess the significance of events, it is hard to imagine how the SBA could have determined which hours of events were the most important, or how it should have adjusted its math to account for that factor.

To be certain, in different circumstances the "other factors" that the SBA should consider, *see Applications for New Awards*, 86 Fed. Reg. at 16272, might well have included the relative significance of events on the schedule.  If a convention were organized around a predominant qualifying live event—think if Taylor Swift sold tickets that offered joint admission to her three-hour concert plus a much longer fan convention of non-qualifying panels and

activities—a total-hours approach without regard to significance would ignore the reason that most people bought their tickets.

That hypothetical is not MomoCon.  The SBA confronted a convention with hundreds of events that was designed to appeal to attendees across a wide spectrum of interests.  *See, e.g.,* AR 1815–22.  Rather than engaging in a subjective inquiry about which of those many events were the most significant, the SBA measured what share of time was devoted to qualifying live events.  That was a permissible choice that was consistent with the SVOG statute, SBA guidance, and the issues facing the SBA.  The Court will not "substitute its judgment for that of the agency," *State Farm,* 463 U.S. at 43, "especially with respect to matters relating to an agency's areas of technical expertise," *Friends of Animals v. Ross*, 396 F. Supp. 3d 1, 7 (D.D.C. 2019) (quoting *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012)).

### B.  The SBA Fairly Endeavored to Quantify the Share of Revenue Attributable to Qualifying Live Events

Under the APA, the agency's role is to resolve factual issues and arrive at a decision that is supported by the administrative record, and the Court is responsible for determining "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Havens v. Mabus*, 146 F. Supp. 3d 202, 214 (D.D.C. 2015) (internal quotation marks omitted).  Factual conclusions are reviewed under the substantial evidence standard and may be overturned where they are "unsupported by substantial evidence in a case." 5 U.S.C. § 706(2)(E); *see Borgess Med. Ctr.*, 966 F. Supp. 2d at 5.  Courts reviewing for substantial evidence "do not ask whether record evidence could support the petitioner's view of the issue, but whether it supports the [agency's] ultimate decision." *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010).

The SBA determined that MomoCon's "predominant activity was the organization and promotion of a fan convention." AR 1815–24.  But that assessment alone would not answer whether MomoCon met the statutory requirement that at least 70% of its revenue (or 70% of its expenses) was generated in relation to a qualifying live event.  AR 1815–16; *see also* 15 U.S.C. § 9009a(a)(3).  MomoCon did not provide expenditure allocations of various events, forcing the SBA to estimate based on the information it had before it.  Thus, as required by the SVOG statute, the SBA endeavored to quantify the amount of MomoCon's revenue and expenses that could be attributed to qualifying live events.  The SBA looked at the full record evidence, including contracts associated with MomoCon 2019 and 2020, promotional flyers, and the schedule for MomoCon 2019, with the assumption that MomoCon 2020 would have likely featured a similar breakdown of events.  *See* AR 1815–24.

Although there are some minor irregularities in the SBA's methodology, the SBA's overall assessment was sound.  The SBA admits that "it was difficult for SBA to ascertain the total hours of MomoCon's 2019 convention."  *See* Defs.' Opp'n & Mem. at 7 (citing AR 1519).  Accordingly, the SBA considered two ways of measuring MomoCon's total hours:

> (1) MomoCon's own allegation that it "hosts" over 800 hours of live concerts, performances, amateur theatrical productions, and other events including cultural programs promoting both Japanese and American artistic works," AR 1547, as the total number of MomoCon 2019 and (2) that over the 4-day event, MomoCon 2019 was open to patrons up to 15 hours each day over the four days, for a total of 60 hours.

*See id.*; *see also* AR 1817.  The Court will consider each of these two scenarios in turn.

In the first scenario, the SBA relied on MomoCon's 800-hour estimate and determined that eligible live performances accounted for only 24 out of the 800 hours.  The SBA's explanation that much of MomoCon's programming—including many hours of panels—did not

qualify as a relevant live event was a decision that fell within the agency's expertise.[10]  *See*

*Friends of Animals*, 396 F. Supp. 3d at 7.  The SBA then considered MomoCon's event

schedule, flyers, and contracts to find that they evidenced approximately 24 hours of live

performing arts events.  *See* AR 1822–24.  Under the SBA's measure, live performing arts

activities accounted for just 3% of MomoCon 2019's programming.  *Id.* at 1822.  That meant the

SBA did not find that MomoCon's principal business activity was hosting or producing eligible

live performances; it further meant that because the SBA decided to apportion revenue according

to hours, MomoCon fell far short of satisfying the 70% revenue threshold outlined in the SVOG

statute.  *Id.*

      MomoCon argues that the SBA failed to account for some of the artistic performances

included on the archived schedule for MomoCon 2019.  Pl.'s Reply at 3–4.  Yet the Final

Remand Decision shows that the SBA considered the entire schedule.  AR 1817–18.  The SBA

recognized that the 24-hours number might not be exactly precise, but found that there were "a

very limited number of potentially qualifying events" outside of the figure.  *Id.* at 1818.

MomoCon asserts that the SBA improperly excluded "storytelling, drawing performances or

martial arts performances" from its calculation of total live performance time.  Pl.'s Mem. at 13.

But MomoCon says little more to explain why these performances should have qualified as live

performance events, and its application contained no information elaborating on the nature of

those events, including no contractual materials.  *See id.* at 13–14.  While the SBA's effort to

scour the schedule for titles and descriptions that evinced an eligible live performing event may

not have caught every single event, there is no indication that the agency made any large scale

---

[10] In fact, MomoCon does not appear to contest most of the SBA's determinations about what types of events fall under the SVOG statute, and makes no argument, for example, that a speaking panel or video game tournament should have been considered as live events.

errors or failed to consider any important information that would be relevant to resolving the problem. *See, e.g.*, *State Farm*, 463 U.S. at 43. And the SBA was not obligated to explain why every single event—out of hundreds—did not qualify as an eligible live performing event. *See Larouche's Comm. v. FEC*, 439 F.3d 733, 738 (D.C. Cir. 2006) ("[A]n agency is not obliged to summarize in its decision the contents of all of the documents in the record before it." (internal quotation marks omitted)). Therefore, the SBA's determination that only 3% of MomoCon's hours of activity were eligible live performing events was reasonable.

In the second scenario, the SBA used the same 24-hour number of live events, but compared it to an assumed 60 consecutive hours that MomoCon 2019 was open. AR 1822. Using this math, eligible live performing events accounted for 40% of MomoCon's operations, again below the requisite 70% threshold. *Id.* This method of measurement is generous to MomoCon, because as explained previously, the convention held many different parallel programming options. To count each hour where at least one live performing event was occurring as an eligible hour—despite the other events happening at the time—ignores the nature of the convention. Regardless, even with this favorable approach, MomoCon still did not come close to satisfying the 70% threshold. *Id.* at 1822 n.1.

Before moving on, the Court must note some flaws in the SBA's second scenario, but these issues do not call the SBA's ultimate determination into question. "There is a fine line between 'harmless error' and 'arbitrary and capricious.' The distinction turns on whether the agency's mistake affected the outcome of its decision or prejudiced the plaintiff." *PAM Squared At Texarkana, LLC v. Azar*, 436 F. Supp. 3d 52, 59 (D.D.C. 2020) (citing *PDK Labs., Inc. v. United States DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004)).

As MomoCon observes, it is perplexing that the SBA's denial decision and briefings on the present motion reference the hours of "registration" when adding up the total time of convention operations, because registration is not an event or activity. *See* AR 1817; Defs.' Opp'n & Mem. at 7. But SBA's final estimate disregarded those registration hours, instead assuming that "over the 4-day event, MomoCon 2019 was open to patrons up to 15 hours each day over the four days, for a total of 60 hours."[11] Defs.' Opp'n & Mem. at 7; AR 1822 n.1. And although MomoCon does not raise this issue, the SBA's 60-hour assumption is slightly off— rather than the convention being open for 15 hours each day, it was open for longer on some days and shorter on others. The Court's reading of the schedule shows 57 hours of events.[12] Nonetheless, this number means that live performing events were still only 42% of the schedule in this second scenario. That 2% difference resembles the type of "missed citation or clerical mistake" that constitutes harmless error. *PAM Squared,* 436 F. Supp. 3d. at 59. Such a minor deviation would not alter the SBA's conclusions, and "the agency's reasoning need not be a model of analytical precision." *Concert Inv., LLC v. Small Bus. Admin.,* 616 F. Supp. 3d 25, 33 (D.D.C. 2022) (appeal pending).

That is all the more true because the second scenario was an alternative option to explore why even that metric would not save MomoCon; the SBA's decision eventually rests on the framework of the first scenario, where simultaneous events are counted as separate hours. After all, MomoCon itself used such a measure in its application. *See* AR 1822 (noting that MomoCon suggested it held over 800 hours of events). Despite finding only 3% of the events to be eligible,

---

[11] Those four days would be Thursday, Friday, Saturday, and Sunday. Registration was also open on Wednesday, but the SBA's 4-day 60-hour estimate does not include Wednesday.

[12] There were 12 hours of events on Thursday, 18 hours on Friday and Saturday, and 8 ½ hours on Sunday, plus an additional half hour of table-top gaming that does not overlap with any other event. *See* Convention Schedule.

"to give MomoCon the benefit of the doubt that it hosted more eligible live performances than evidenced by its concert schedules, promotional materials and contracts provided," the SBA bumped the number up to 10%. *Id.* Again, this favorable assumption did not approach the crucial 70% SVOG threshold.[13]

Therefore, based on the record evidence, the SBA determined that "MomoCon has failed to demonstrate that at least 70% of its earned revenue is generated through . . . a live event." *Id.* at 1824. This denial demonstrated "a rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168), and the SBA adequately "state[d] its reasoning," *Select Specialty Hosp.–Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014) (quoting *Checkosky v. S.E.C.*, 23 F.3d 452, 463 (D.C. Cir. 1994)). In addition, as explained above, the SBA's conclusion was supported by substantial evidence. *Fla. Gas Transmission Co.,* 604 F.3d at 646. That much is enough—the Court may not "substitute [its] judgment for the agency's," even if it "might have reached a different conclusion in the first instance." *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 918 (D.C. Cir. 2017).

## C. The SBA Has Adequately Explained MomoCon's Alleged Disparate Treatment

The Court has previously confronted MomoCon's claim that the SBA denied its application while approving applications from similar competitors, without offering any explanation for why MomoCon was different.[14] *See* Mem. Op. at 10. The Court agreed that this omission made the SBA's denial arbitrary and capricious, because the SBA's failure to

---

[13] And to put it plainly, the Court sees no evidence in the record to indicate that MomoCon's live performances were anywhere near 70% of its programming.

[14] As mentioned earlier when discussing the SBA's motion to stay, the Court recognizes that the D.C. Circuit may issue an opinion in *Concert Investor* that bears upon this issue.

differentiate MomoCon meant that it was potentially violating the rule that "[a]n agency may not treat like cases differently." *Id.* (quoting *Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543, 551 (D.C. Cir. 2009)).

The Final Remand Decision incorporates a "MomoCon LLC Competitor Analysis," AR 1792–94, that looks at MomoCon's alleged competitors. *See id.* at 1824 (incorporating the memo by reference). In that analysis, the SBA noted that "[a]ll of the conventions analyzed herein appear to operate in a similar fashion." *Id.* at 1792. Much like MomoCon, "[i]n many instances, the applicant's financial statements do not separately delineate revenue or expenses attributable to eligible SVOG live performances." *Id.* Thus, the SBA explained that because "numerous convention activities that are non-eligible live performances run currently with eligible or potentially eligible SVOG live performances, the reviewer endeavored to make reasonable estimations for those categories by examining the available event schedules, website information, financial statements, ticketing information, and/or contracts, to determine the applicant's business activity." *Id.*

Under this approach, which mirrors the way the SBA analyzed MomoCon, the SBA estimated values for all five of the competitors that were "not sufficient to demonstrate that the applicant's principal business activity is the hosting or production of eligible SVOG live performances." *Id.* at 1793–94. The SBA determined that "there is a strong likelihood that the above companies were improperly awarded because they cannot demonstrate that their principal business activity was the hosting or production of eligible SVOG live performances." *Id.* at 1794. The SBA recommended that the awards be referred to the recoupment process to recover repayment for improper awards. *Id.* at 1794, 1824.

This explanation alleviates the SBA's previous failure to differentiate MomoCon from these competitors. [15]  *See* Mem. Op. at 10.  Still, MomoCon argues that it will continue to operate at a "competitive disadvantage as a result of the SBA's error with no concrete assurance that the agency will take action to remedy it."  Pl.'s Reply at 6.  The Court disagrees that the SBA must offer any full assurances that it will recoup the incorrect awards.

The Court previously observed that "[r]escission of funds granted to MomoCon's competitors would moot this ground for challenging the denial of MomoCon's application, but mere uncertain plans to do so in the future do not."  Mem. Op. at 9 n.2.  On November 28, 2023, the Court requested an update about the status of the funds granted to MomoCon's competitors.  *See* Min. Order, Nov. 28, 2023.  In response, the SBA provided an update that shows the recoupment process has proceeded slowly.  *See* Joint Status Report, ECF No. 71.  The SBA stated that it is "required to participate in a recoupment process, which involves due process and practices in accordance with federal debt collection laws."  *Id.* at 1.  The SBA said it was "sending requests for information to each grantee and allowing grantees to provide additional information to address eligibility concerns," *id.*, and that "the agency expects the first set of

---

[15] "The APA limits judicial review to the administrative record 'except when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review.'"  *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 514 (internal quotation marks omitted) (quoting *Com. Drapery Contractors, Inc.*, 133 F.3d at 7.  In its summary judgment briefing, MomoCon supports its differential treatment claim by listing several other supposed competitors that received SVOG awards, including the "Charleston Wine & Food Festival," "Poteet Strawberry Festival Association," "Taste of Atlanta, Inc.," "Pittsburgh Irish Festival Inc.," and "Rio Grande Valley Celtic Festival Association."  Pl.'s Mem. at 11.  MomoCon does not show that these competitors were introduced in the administrative record.  The Court has also not located any mention of these competitors in the record, and they are notably absent from the portion of MomoCon's "SVOG Appeal Justification" document that lists the competitors that the SBA *did* address in the Final Remand Decision.  *See* AR 86–87.  Because these competitors were not presented administratively, and there is no showing of the bad faith or barren record that could justify an exception to the usual rule, the Court will not consider them in its review of the Final Remand Decision.

demand letters to be sent the week of December 11, 2023," *id* at 2.  After that, the SBA would decide whether to send a formal demand letter determining ineligibility "as early as this month through anytime during the first quarter of 2024," followed by an appeal process for the grantees. *Id.* at 2.

In other words, the SBA appears to be some time away from any rescission of the funds given to MomoCon's competitors, meaning that this issue is not moot.  Nonetheless, the Court is unpersuaded by MomoCon's assertion in the Joint Status Report that it should triumph because "it is now apparent that the agency's plans to recoup awards are even more uncertain than represented in the final remand decision."[16]  *Id.* at 2.  To be sure, the SBA is not moving quickly: the Final Remand Decision stated the SBA would recommend recoupment over a year ago.  AR 1824.  But the Court finds that the SBA took notice of its disparate treatment of MomoCon and is following the process to address that mistake.  *Concert Inv.*, 616 F. Supp. 3d at 33 ("In this case, the SBA is well beyond 'uncertain plans'—it has already concluded that rescission is appropriate and has referred the three similar companies to a program to recoup the improperly awarded funds.").  The SBA's Final Remand Decision on MomoCon's application cannot automatically recoup SVOG funds from competitors, and the agency must follow its recoupment procedures to give those entities a chance to introduce more information supporting their awards. Joint Status Report at 2.

Consequently, the Court is unpersuaded by MomoCon's argument that the Final Remand Decision was arbitrary and capricious because the SBA has not yet recouped awards from

---

[16] MomoCon also requests oral argument.  Joint Status Report at 2.  The allowance of oral hearings is "within the discretion of the Court."  LCvR 7(f).  Because the parties' written briefings are sufficient to resolve the instant motion, the Court declines to conduct an oral hearing.

MomoCon's competitors.  "The mere fact that the [agency] may have nodded on one occasion does not entitle a litigant to a repetition of its blunder."  *Chem-Haulers, Inc. v. Interstate Com. Comm'n*, 565 F.2d 728, 730 (D.C. Cir. 1977); *see also Concert Inv.*, 616 F. Supp. 3d at 33 ("[I]t is well-established that an agency's recognition that an honest mistake was previously made can itself be a legitimate justification for differential treatment.").  There is no reason to keep this litigation alive indefinitely until entirely separate recoupment processes have resolved for MomoCon's competitors.  Unlike the initial denial, the SBA has now applied its methods to those competitors and acknowledged a mistake.  That is sufficient, and so the Court will uphold the SBA's second denial.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (ECF No. 53) is **DENIED** and Defendants' motion for summary judgment (ECF No. 55) is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  December 22, 2023                              RUDOLPH CONTRERAS
                                                       United States District Judge